[Crim. No. 35727. Second Dist., Div. Five. Jan. 7, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
CHUCK FOSTER, Defendant and Appellant.

424

COUNSEL

Robert O. Huber, under appointment by the Court of Appeal, and Cunningham, Lansden & Huber for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Sandy R. Kriegler, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

TORRES, J.*—Defendant was charged in a two-count information with arson (Pen. Code, § 449a) and insurance fraud (Pen. Code, § 548).[1] The jury found defendant guilty as charged and he was sentenced to prison. He appeals.

FACTS

In December of 1976, defendant purchased a 1977 Travel Queen Motor Home, hereafter referred to as Travel Queen. He made a down payment of $8,753.60 and obtained a loan of $18,000 from Crocker Bank in South Arcadia. License fees were paid at the time of purchase, the registration expiring in December 1977. The vehicle registration was sent to defendant and the pink slip to the bank as the legal owner. A condition of the bank loan required the defendant to maintain comprehensive and collision insurance coverage. The Travel Queen was insured through Allstate until August 17, 1977, when the policy was cancelled for nonpayment of premium.

During the period in question, defendant maintained an apartment at the Marina City Club. He had entered into a contract with the club for certain promotional activities in exchange for reduced rental rates and other benefits. The contract was terminated in September 1977. Defendant continued to live at the Marina City Club until April 1978. When he moved out, he owed in excess of $2,300 for back rent and membership. Defendant parked the Travel Queen in a lot adjacent to the Marina City Club. The Travel Queen had "Galliano Liquore" advertising painted on its side. In March of 1978 the Travel Queen was parked without license plates. A deputy sheriff spoke to defendant about the absence of license plates. Defendant was not given a citation because he stated there was a mix-up with the Department of Motor Vehicles and the plates were in the mail.

John Benardello, age 19, was introduced to the defendant in November or December 1977. Benardello who was involved in burglaries and stolen property, offered to sell defendant various stolen items over the next few months. In March of 1978, defendant discussed with Benardello the destruction of the Travel Queen. Defendant told Benardello he

---

*Assigned by the Chairperson of the Judicial Council.

[1]John Mike Gendian was also charged in both counts of the information. Gendian was not tried with defendant and is not a party to the instant appeal.

would be out of town the weekend of March 11 and 12, and would return on Monday, March 13, 1978. The Travel Queen, which was to be parked at a specific location, was to be taken to Mexico and destroyed. Benardello's payment was to be from the sale of any equipment removed from the Travel Queen.

Defendant, in connection with his business, had taken out a general and nonowned automobile liability policy in September of 1977. The policy was placed through Truman Van Dyke Company, independent brokers. The policy covered defendant's business, but not vehicles owned by him. On March 10, 1978, defendant phoned Michael Cornwell, an account executive at Truman Van Dyke Company and requested that the Travel Queen and a Datsun 280Z be covered by "comprehensive collision" and added to his coverage. Mr. Cornwell obtained the necessary information from defendant, and informed defendant he was covered as of that day. Truman Van Dyke Company had authority to bind the insurance carrier as to additions to existing policies.

On March 11, 1978, defendant parked the Travel Queen at the specified location. He was then driven by car to Los Angeles International Airport. He departed Los Angeles that evening for Washington D. C. and returned to Los Angeles the evening of March 13, 1978.

Benardello had contacted Danny Bradley and John Gendian about taking the Travel Queen to Mexico. Bradley had experience taking cars to Mexico for insurance purposes. However, Bradley balked at going to Mexico in a vehicle without license plates, so it was decided they would instead go to Palmdale.

On Sunday, March 12, 1978, Benardello and Gendian picked up the Travel Queen at the specified location and drove it to Michael's Foods. There they removed the microwave oven, blender, generator and television. The microwave was sold to the owner of Michael's Foods and the remainder of the property was taken to Gendian's residence. Benardello drove defendant's Travel Queen to the Palmdale area, followed by Gendian and Bradley in Gendian's car. Near Acton, Bradley got into the Travel Queen and drove it up a dark road. Bradley stopped the Travel Queen, poured gas throughout and ignited it with a match.

Fire Fighter Meece responded to the scene of the fire around midnight on March 12, 1978. The Travel Queen was burned on Hubbard Road

in Acton. The Travel Queen was observed at the scene to have the "Galliano" advertisement on its side.

Defendant informed Mr. Cornwell at the Truman Van Dyke Company of the loss of the Travel Queen on March 13, 1978. Defendant stated he had been in Washington D.C. over the weekend and was upset about the loss. Mr. Cornwell instructed defendant to get the facts together.

Detective James Raines, Los Angeles Sheriff's Department was assigned to investigate the destruction of the Travel Queen. Sergeant Bob Briley, an expert arson investigator examined the Travel Queen and formed the opinion the fire was caused by a flammable accelerate scattered throughout the interior and ignited by flame. He informed Detective Raines of his findings.

Defendant previously owned a 1977 Titan Motor Home. He financed the Titan by a loan of $16,500 on September 23, 1976, from Crocker Bank in Arcadia. The Titan was insured by Allstate. On November 25, 1976, Fire Fighter Meece[2] responded to the scene of a fire of defendant's Titan Motor Home two to three miles south of Palmdale. Once the fire was extinguished, Meece examined the Titan and detected the odor of diesel fuel. He did not observe any video equipment in the Titan. No arson investigation was undertaken in regards to the Titan fire.

Defendant reported the Titan stolen from a service station lot and filed a claim for the loss. On December 22, 1976, Allstate Insurance Company paid $16,778.90 to Crocker Bank (legal owner), the amount of the unpaid loan balance. Allstate Insurance Company also paid defendant $18,221.10 for equipment defendant claimed was lost in the fire.[3] Detective Raines[4] had been assigned to investigate the Titan loss. He spoke with defendant by phone concerning the loss.

Detective Raines notified Mr. Cornwell of the Truman Van Dyke Company on March 15, 1978, that the burning of the Travel Queen might be due to arson. He obtained their cooperation in the investigation and was advanced $500 to use in an undercover capacity in an

---

[2] Fire Fighter Meece is the same person who responded to the Travel Queen fire. He testified that the two locations were five to six miles apart.

[3] Video equipment, blender, vacuum, microwave, mobile phone, CB radio, typewriter, cassette deck, desk file cabinet and calculator.

[4] The same Deputy Raines who investigated the Travel Queen.

attempt to purchase some of the equipment taken from the Travel Queen. Truman Van Dyke Company informed the insurance carrier of the claimed loss, the arson investigation, and recommended that defendant's insurance be cancelled. The insurance carrier denied the claim and cancelled defendant's insurance. Defendant actually filed a claim for the loss of the Travel Queen on March 21, 1978.

Detective Raines, in an undercover capacity, was able to purchase the generator and power converter taken from the Travel Queen from Benardello[5] and Bradley on March 18, 1978. In the execution of a search warrant various items removed from the Travel Queen were recovered at Gendian's residence. A search warrant was also obtained for defendant's apartment. Phone bills were recovered which indicated that calls in February 1978, were made from defendant's phones to the phones of Gendian and Benardello. The microwave taken from the Travel Queen was recovered from the owner of Michael's Foods.

Defendant testified in his defense that he had two motor homes stolen and destroyed prior to the time he acquired the Travel Queen. The first motor home was stolen in 1974 and recovered in Santa Monica. Defendant recovered $5,000 or $6,000 in insurance proceeds. A second motor home, the Titan, was taken from a service station parking lot in 1977 and destroyed less than one week after it was insured with Allstate. Allstate paid off the balance of the loan to the bank and paid defendant for the missing equipment. Defendant then purchased the Travel Queen. The license plates on the Travel Queen were damaged in an accident and his initial attempt to replace them was unsuccessful. Defendant admitted meeting Benardello in November 1977, but denied any knowledge of Benardello's unlawful activities. Defendant stated they parted company on unfriendly terms in 1978.

Lori Levoff[6] testified in rebuttal that she was living with defendant in 1976 when he owned the Titan. Defendant said he wanted a bigger motor home, and planned to destroy the Titan and use the insurance proceeds for a new vehicle. Defendant left the Titan at a gas station in San Marino, and "stole" it with an extra set of keys at night.

[5]Benardello was given immunity by the People and testified against the defendant on the People's case-in-chief.

[6]Lori Levoff's name came up during the defense. She was contacted during the trial and agreed to testify after receiving immunity.

Defendant took the Titan to Ms. Levoff's parent's home, where he removed various items. Defendant then drove the Titan to the desert followed by Ms. Levoff in another vehicle. Defendant had informed Ms. Levoff that he was going to light flares and put them under the plastic gas cans, and in seven minutes the cans would explode. Ms. Levoff observed the Titan explode into flames. She helped him prepare a false list of items which was to be used in the insurance claim.

ISSUES

Defendant Foster contends that: (1) insufficient evidence was presented that the motorhome was "the property of another," pursuant to Penal Code section 449a; (2) the jury instruction regarding the elements of Penal Code section 449a is an improper statement of the law; (3) the jury instruction stating that the insurance policy need not be valid for purposes of Penal Code section 548 is an improper statement of the law; (4) failure to produce the tape recording of the conversation between the defendant and the prosecution witness, Mr. Cornwell, was a denial of due process; and (5) admission of evidence concerning the prior burnings of motor homes was improper.

DISCUSSION

I

██ Defendant argues that there is insufficient evidence to support his conviction under Penal Code section 449a[7] because the Travel Queen which was burned was not the property of another person.

In the case at bench, Crocker Bank loaned defendant $18,000 for the purchase of the Travel Queen and received the pink slip from the Department of Motor Vehicles as the legal owner. Upon destruction of the Travel Queen by fire, the bank was paid by its own insurance company for the loss of the Travel Queen.

---

[7]Former Penal Code section 449a under which appellant was prosecuted, provided as follows: "Any person who willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels or procures the burning of any barrack, cock, crib, rick or stack of hay, corn, wheat, oats, barley or other grain or vegetable product of any kind; or any field of standing hay or grain of any kind; or any pile of coal, wood or other fuel; or any pile of planks, boards, posts, rails or other lumber; or any streetcar, railway car, ship, boat or other watercraft, automobile or other motor vehicle; or any other personal property not herein specifically named except a trailer coach, as defined in Section 635 of the Vehicle Code; (such property being of the value of twenty-five dollars ($25) and the property of another person) shall upon conviction thereof, be sentenced to the state prison."

Defendant was the owner of the vehicle because he was entitled to possession of the Travel Queen under the security agreement with Crocker Bank (Veh. Code, § 460).[8] Crocker Bank was the legal owner of the Travel Queen because it had a security interest in the vehicle (Veh. Code, § 370).[9] A security interest is "an interest in personal property or fixtures which secures payment or performance of an obligation." (Cal. U. Com. Code, § 1201, subd. (37).) Clearly, Crocker Bank had a property interest in the Travel Queen.

## II

■ Defendant contends the trial court erroneously instructed the jury on the elements of Penal Code section 449a pursuant to CALJIC No. 14.85[10] in that the instruction failed to indicate the destroyed property must be the property of another.

■ A trial court must instruct on the general principles of law governing the case. The general principles of law are those commonly or openly and closely connected with the facts of the case before the court. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 681 [160 Cal.Rptr. 84, 603 P.2d 1] *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].)

■ Defendant is correct when he states CALJIC No. 14.85 (1979 revision) as given by the court is improper as it does not include any

[8]Vehicle Code section 460 provides as follows: "An 'owner' is a person having all the incidents of ownership, including the legal title of a vehicle whether or not such person lends, rents, or creates a security interest in the vehicle; the person entitled to the possession of a vehicle as the purchaser under a security agreement; or the State, or any county, city, district, or political subdivision of the State, or the United States, when entitled to the possession and use of a vehicle under a lease, lease-sale, or rental-purchase agreement for a period of 30 consecutive days or more."

[9]"A 'legal owner' is a person holding a security interest in a vehicle which is subject to the provisions of the Uniform Commercial Code, or the lessor of a vehicle to the State or to any county, city, district, or political subdivision of the State, or to the United States, under a lease, lease-sale, or rental-purchase agreement which grants possession of the vehicle to the lessee for a period of 30 consecutive days or more."

[10]The jury was instructed pursuant to CALJIC No. 14.85 as follows: "[Defendant is charged in [Count I of] the information, with the commission of the crime of arson, a violation of Section 449(a) of the Penal Code.]

"Every person who willfully and maliciously sets fire to or burns any motor home is guilty of the crime of arson.

"In order to prove the commission of such crime, each of the following elements must be proved:

"1. That a person set fire to or burned a motor home, and

"2. The the fire was set intentionally and maliciously.'

reference to property "of another" as is set forth in the elements of former Penal Code section 449a. The modified instruction[11] submitted by the defense should have been given.

■ "'In California, an erroneous refusal to give a requested instruction or the giving of an erroneous instruction is not reversible error unless it results in a miscarriage of justice. (Witkin, Cal. Criminal Procedure (1963) § 491, p. 497.)'" (*People* v. *Epps* (1973) 34 Cal.App.3d 146, 168 [109 Cal.Rptr. 733].) ■ In the case at bench the failure to give defendant's modified version of CALJIC No. 14.85 was nonprejudicial. There was no factual dispute about the bank's security interest in the Travel Queen and the fact that Benardello and his associates actually burned the motor home. The bank was paid by its own insurer for the loss. Defendant has failed to sustain his burden of proving a result more favorable to him would have been reached by the jury had the modified CALJIC No. 14.85 been given by the court. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## III

■ Defendant contends the jury was improperly instructed that the insurance policy need not be valid for purposes of Penal Code section 548 pursuant to CALJIC No. 14.89.[12]

There is no requirement that the insurance policy be enforceable or valid under Penal Code section 548. "Proof of valid collectible insurance is not essential. Indeed, intentionally setting fire to premises would invalidate the policy and prevent any recovery." (1 Witkin, Cal. Crimes, § 469.) "It was not necessary for the prosecution to prove that the Hartford Insurance Company was legally incorporated, or that the policy was valid and that the defendant could maintain an action thereon for loss or damage. His guilt or innocence of the offense charged in this indictment cannot be made to depend upon any such questions." (*People* v. *Hughes* (1865) 29 Cal. 257, 260.) "The crime may be complete,

---

[11]To be found guilty of arson under section 449a, one must: 1. Willfully and maliciously 2. set fire to, or burn, or cause to be burned, 3. an automobile or property 4. which is the property of another person.

[12]CALJIC No. 14.89 provides as follows: "The commission of the crime with which defendant is charged is not dependent on whether an insurance policy on the property was actually valid if, at the time of the alleged burning, the defendant believed that the policy was valid and in force. Neither is it an element of such crime that the person committing it shall have gained any benefit from his acts."

though the policy be invalid, if defendants believed it to be valid and committed the act with the intent to collect on the policy." (*People* v. *Morley* (1908) 8 Cal.App. 372, 375 [265 P. 276].)

The jury was properly instructed in the law when the court gave CALJIC No. 14.89.

## IV

█ Defendant argues that the failure by the prosecution to produce a tape recording of a conversation between the defendant and Mr. Cornwell was a denial of due process.

█ Due process requires the prosecution to disclose material evidence to the defense (*People* v. *Ruthford* (1975) 14 Cal.3d 399, 408-409 [121 Cal.Rptr. 261, 534 P.2d 1341]; *In re Ferguson* (1971) 5 Cal.3d 525, 533 [96 Cal.Rptr. 594, 487 P.2d 1234].) The burden is on the accused to establish prejudice where there has been a lack of timely discovery, and in the absence of prejudice the judgment must be affirmed. (*People* v. *Sewell* (1978) 20 Cal.3d 639, 646 [143 Cal.Rptr. 879, 574 P.2d 1231]; *People* v. *Reyes* (1974) 12 Cal.3d 486, 502 [116 Cal.Rptr. 217, 526 P.2d 225].)

█ The tape in question was discovered by Deputy Raines during the defense. Late one afternoon in checking for an address and telephone number of a potential witness in the case, Deputy Raines went through all the envelopes and a small box and found a tape recording. He immediately called it to the attention of the prosecutor who notified defense counsel the next morning. The tape recording was played for the benefit of defense counsel.

At a hearing outside of the presence of the jury the prosecutor informed the court, as he had defense counsel, that the tape was prejudicial to the defense and he would not offer it in evidence. It appears the tape would have been of more benefit to the prosecution than the defense. The trial court stated to defendant: "The trial is not over. You haven't rested. If it is invaluable, why not use it [tape recording] now." Defendant's motion for a mistrial was denied.

█ We are not dealing with evidence which has been suppressed by the prosecution. This case involves discovery not being completed in a timely fashion. "Suppressed evidence is that evidence favorable to the

defendant which the prosecution fails to disclose prior to or during trial." (*People* v. *Manson* (1976) 61 Cal.App.3d 102, 145 [132 Cal.Rptr. 265].)

■ A review of the record reveals that the defendant made no factual showing of any specific matter that could have been of benefit to him in either cross-examination of Mr. Cornwell or in his defense.[13] Mr. Cornwell was not recalled for further cross-examination. There was no denial of due process.

## V

■ Finally, defendant contends that the admission of evidence concerning the prior burnings of motor homes was improper.

At the conclusion of an evidentiary hearing under section 402 of the Evidence Code, the court ruled that any evidence as to an incident in 1974 involving a trailer destroyed by fire was inadmissible.[14]

However, the court ruled evidence of the 1977 Titan would be admissible and stated: "There are sufficient common marks. They seem to quite closely correspond to the marks indicated in the *Maler* case, *People* v. *Maler* (1972) 23 Cal.App.3d 973 [100 Cal.Rptr. 650], and which would go as to intent, to motive, knowledge and one other thing, in this case, common scheme and plan."

Evidence Code section 1101, subdivision (b) allows for the admission of prior crimes or acts when relevant to prove issues in dispute other than the defendant's disposition to commit such acts. ■ Evidence of prior fires involving property of a defendant charged with arson and insurance fraud is admissible to prove intent, motive and knowledge.

---

[13]After the tape was played for benefit of the court (out of the presence of the jury) the following colloquy occurred: "DEFENSE COUNSEL: Well I am just going to start out by commenting that, insofar as any prejudice of the defendant is concerned, if I were the people, I would like to play this tape to the jury, to be very frank to [*sic*] you, and there are several things in there which are discrepancies involving the defendant.

. . . . . . . . . .

"THE COURT: I can see the people would like to put this in, and I would say it would very much prejudice the defense to have this tape in. And I can't see anything there that would have changed your theories on the case. . . . As a matter of fact your man was there. He could very well advise you as to what did take place there. He was there. He was on that tape. He was talking to Mr. Cornwell. It is no surprise to him. You have been in communication with him. . . . I can't find any prejudice to your case or anything you could put in differently."

[14]Defendant introduced evidence concerning the 1974 incident either on cross-examination of witnesses or defendant's direct testimony.

(*People* v. *Maler* (1972) 23 Cal.App.3d 973, 978-980 [100 Cal.Rptr. 650]; *People* v. *Furgerson* (1962) 209 Cal.App.2d 387, 389-390 [25 Cal.Rptr. 818]; *People* v. *Miller* (1960) 185 Cal.App.2d 59, 79 [8 Cal.Rptr. 91].)

██  Evidence of the prior fire and insurance settlement of the Titan was relevant in the case at bench to prove defendant's intent and motive to collect on insurance after its arsonous destruction and his familiarity with recovery on an insurance claim as a ready source of cash. These facts are directly on point with the court's statement in the case of *Maler, supra,* at page 979: "Just as in *Furgerson,* in each of the prior fires with which defendant here has been associated, an insurance claim had been filed; therefore, like *Furgerson,* we hold that the evidence of the prior fires was relevant to the issues of defendant's intent, motive, and knowledge (familiarity with recovery)." Defendant's contention that the prior burning was admitted for purposes of showing identity lacks merit. The trial court clearly stated its reasons for admitting the evidence of the Titan burning and identity was not a reason cited. The trial court relied on the *Maler* case which we find to be controlling in the case at bench.

### DISPOSITION

The judgment is affirmed.

Kaus, P. J., and Ashby, J., concurred.